UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | No. 04-cr-10288-RWZ |
| | ) | |
| JARED KNOWLTON | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Jared Knowlton respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the purposes of punishment required by Title 18 United States Code §3553(a) in light of the principles set forth in *United States v. Booker,* 543 U.S. 220 (2005).

**I. Introduction**

Perhaps the best statement of the function of judges in sentencing defendants in criminal cases was set forth by the Supreme Court in *United States v. Koon*, 518 U.S. 81 (1996):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. 518 U.S. at 113.

The individuality of each defendant and the uniqueness of each case were largely removed from the consideration of federal judges by the United States Sentencing Guideline in 1987. *Booker,* however, restored to the district courts the ability to fashion a sentence tailored to the unique circumstances of each case and the individual situation of each defendant by requiring sentencing judges to consider factors other than the sentencing range prescribed by the sentencing guidelines. Under 18 U.S.C. §3553(a),

1

judges are required to sentence below the range if such a sentence would be sufficient to achieve the purposes of the statute. The guideline sentencing range is only one of five co-equal factors to be considered in determining a sentence. *Booker*, 125 S. Ct. at 764-65. The other four factors are (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid *unwarranted* sentencing disparity (emphasis added); and (4) the need to provide restitution.

In light of *Booker,* the Guidelines are advisory, not mandatory. *United States v. Jimenez-Beltre,* 440 F. 3d 514 (1st Cir. e*n banc* 2006). They maintain substantial but not controlling weight; and if there are clearly identified and persuasive reasons why the Court ought not to impose a sentence within the Guideline sentencing range, it ought to consider those reasons and impose a sentence accordingly. *Id.* At 516. *Booker* "makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *Id.* At 518. Notwithstanding the prosecutorial jubilation and the defense bar's hand-wringing engendered by *Jimenez-Beltre*, the district court has considerably more sentencing latitude than it did pre-*Booker*:

> Assuming that the district court correctly calculates the guidelines (sic) range and its reasoning is express or can be discerned, the remaining question . . . is one of *reasonableness* . . . Often, there can be more than one reasonable way of assessing a factor and more than one reasonable result. Assuming a plausible explanation and a defensible overall result, sentencing is the responsibility of the district court. *Jimenez-Beltre,* 440 F.3d at 519. (Emphasis in original).

In the case at bar there is "a plausible explanation and a defensible overall result" *Id.,* for the imposition of a sentence below the advisory Guideline sentencing range.

In sentencing Knowlton, the Court must proceed according to the three-step sequence endorsed by the First Circuit in *Jimenez-Beltre* at 518-19: (1) It must first determine the applicable Guideline sentencing range; (2) it must then consider and either

2

accept or reject any proposed departures from that range; (3) and finally, it must determine "whether other factors identified by either side warrant an ultimate sentence above or below the guideline range."

## II. The Guideline Sentencing Range

### A. Base Offense Level

At the very most, the greatest quantity of OxyContin attributable to Knowlton is 100 80mg. pills. Knowlton's one and only appearance and act of participation in this multi-defendant indictment occurred on December 2, 2003. On that date he accompanied co-defendant Joseph Baldassano to a meeting Baldassano had pre-arranged with undercover law enforcement agents. The purpose of that meeting was for Baldassano to deliver to the undercover agents 100 80 mg. OxyContin pills that Baldassano, not Knowlton, had previously arranged to sell to the agents. Knowlton accompanied Baldassano to a restaurant in Peabody, Massachusetts where he and Baldassano sat at a table with the agents for the purpose of selling the 100 OxyContin pills to them. The actual delivery of the pills to the agents was made by co-defendant, Keith Behsman, at Baldassano's behest. Knowlton's only participation was to take from one of the agents the sum of $5,500.00 in payment for the pills. He played no prior or further role in the conspiracy alleged in the indictment.

The government's argument that at least 230 80 mg. OxyContin pills are attributable to Knowlton is specious. That argument proceeds from the premise that Knowlton was involved in a prior distribution of 100 80 mg. pills on November 25, 2003. That premise is derived from part of the conversation that ensued at the restaurant table among Baldassano, Knowlton, and the two undercover agents. During that conversation, the agents complained to Baldassano that a prior delivery of pills contained 98 pills

3

instead of 100, for which they paid. That prior delivery is alleged to have taken place on November 25, 2003. It has never been alleged or proved, nor has Knowlton admitted, that he was involved in the November 25th transaction. The government's "proof" is derived solely from Knowlton's part in the conversation during the December 2nd transaction. In response to the agents' complaints that they had been previously "shorted," Knowlton is alleged to have said that "we" counted the pills three times on this occasion because of what happened the "last time." In addition to being merely a spontaneous response to a provocative complaint made by the agents, Knowlton's part in the conversation at the table was nothing more than his engaging in the same sort of "huffing and puffing" Baldassano was actively engaging in at the same time. See *United States of America vs. Carlos Espinola and Joseph Allen,* Jury Trial Day Five, May 12, 2006, Transcript of Testimony of Joseph Baldassano, 31: 15-16. Just as Baldassano was lying to the agents on that occasion relative to the availability and price of OxyContin, *Ibid.* at 28: 16-19, so too was Knowlton "puffing" in his inferential allusion to his "participation" in the November 25th transaction.

      Finally, the government's position with respect to Knowlton's "participation" in the November 25th transaction is completely destroyed by its own primary witness, Joseph Baldassano, who testified under direct examination by the government that Knowlton's involvement "in this business" was limited to "*one* occasion" when he traveled with Baldassano on December 2, 2003 "to Bugaboo Creek to sell *100* pills." See *United States of America vs. Carlos Espinola and Joseph Allen,* Jury Trial Day Four, May 11, 2006, Transcript of Testimony of Joseph Baldassano, 51: 6-8. (Emphasis added). It is clear that the Probation Officer who prepared the revised Presentence Report either did not have access to Baldassano's testimony or did not consider it in concluding at paragraph

4

numbered 96 of the revised report that Knowlton was responsible for the 100 pill November 25th transaction. It is noteworthy that the Probation Officer's conclusion in the preliminary Presentence Report that Knowlton was responsible only for the 100 pill December 2nd transaction was based on the very same paragraph numbered (20) upon which the Probation Officer concluded in the revised report that Knowlton was responsible for the November 25th transaction as well. As the government provided the Probation Officer no additional information beyond that which it provided to her in connection with the preliminary report, and as the Probation Officer clearly did not consider Baldassano's testimony which exonerated Knowlton of the November 25th transaction, her conclusion that Knowlton was responsible for 200 pills or 103.18 kilograms of marijuana equivalency is erroneous and ought not to be adopted by the Court.

The government's position that the November 25th transaction was reasonably foreseeable to Knowlton is likewise groundless. That position is based solely upon the allegation that Knowlton was involved with members of the Baldassano group who regularly "hung out" together. That group, however, "hung out" not for the purpose of distributing drugs, but for the purpose of *using* drugs. *Ibid.* at 50: 12-25, 51: 1-5. (Emphasis added). Once again the government's position is completely undercut by its own primary witness, and nothing more need be said on this issue.

Finally, the government's attempt to attribute to Knowlton the 30 to 50 80 mg. OxyContin pills Joseph Baldassano sold to James Gardner on December 2, 2003 is once again directly contradicted by Baldassano himself. Baldassano testified that after the 100 pill transaction to the undercover agents, Gardner met him in Peabody "to pick up pills from *me* also." See *United States of America vs. Carlos Espinola and Joseph Allen,* Jury Trial

Day Four, May 11, 2006, Transcript of Testimony of Joseph Baldassano, 65: 1-2. (Emphasis added). Baldassano testified that, "*I* met Mr. Gardner in Newbury Comics and delivered pills to him." *Ibid.* at 65: 19-20. (Emphasis added). Baldassano's testimony, *Ibid.* at 66: 4-14, makes it certain that he and he alone conducted the 30 to 50 pill transaction with Gardner. He made absolutely no mention of Knowlton being involved in that transaction. Thus, the greatest quantity of OxyContin that the government can possibly attribute to Knowlton is 100 80 mg. pills.

Pursuant to the Drug Equivalency Table at U.S.S.G. §2D1.1, one gram of oxycodone (the active ingredient in OxyContin) is equivalent to 6,700 grams of marijuana. In total, Knowlton is accountable for 50,920 grams, or 50.9 kilograms of marijuana equivalency. Pursuant to Guideline §2D1.1(c)(10), the base offense level is 20 because the amount of marijuana for which Knowlton is responsible is at least 40 kilograms but less than 60 kilograms.

### B. Adjustment for Role in the Offense

Pursuant to U.S.S.G. §3B1.2(a), based on a defendant's role in the offense, his offense level should be decreased by 4 levels since he was a minimal participant in the charged criminal activity. *Application Note 4* to §3B1.2 instructs that subsection (a) "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." As set forth in particular detail in section II. A. above, Knowlton's participation in this wide-ranging conspiracy involving the distribution of thousands, if not tens of thousands, of OxyContin pills was limited to participation in the distribution of only 100 pills on only one isolated occasion. Although

"[i]t is intended that the downward adjustment for a minimal participant will be used infrequently," the government is utterly unable to prove anything more than that Knowlton was an OxyContin addict who aided and abetted his girlfriend's brother in a single distribution among the hundreds encompassed by the instant indictment. This is certainly one of those infrequent occasions where a 4 level downward adjustment for minimal participant is clearly appropriate and warranted.

The revised Presentence Report disagrees that Knowlton should receive a downward adjustment for minimal participant in no small part because "he was involved in one very large transaction with Baldassano and appears to have been involved with, and to have had knowledge of, another significant transaction that was within the scope of the jointly undertaken criminal activity." It is not clear whether the Probation Officer is referring here to the November 25th 100 pill transaction or to the December 2nd 30 to 50 pill sale to Joseph Gardner. Regardless of which transaction is being referred to, based upon Baldassano's direct testimony for the government in the *Espinola/Allen* trial, it is clear that Knowlton played no part in nor had any knowledge of either transaction; and the December 2nd 100 pill transaction is the sole event in which he took part or which was reasonably foreseeable to him.

### C. Adjustment for Acceptance of Responsibility

Knowlton has met all the criteria enumerated in U.S.S.G. §3E1.1(a) and (b). Accordingly, he is entitled to a 2 level downward adjustment for acceptance of responsibility, assuming he is awarded a downward adjustment for minimal participant. Otherwise, he is entitled to a 3 level downward adjustment for acceptance of responsibility. Counsel acknowledges that in his Objections to the Presentence Report he incorrectly awarded Knowlton a 3 level downward adjustment irrespective of whether he

was awarded a downward adjustment for minimal participant.

### D. Total Offense Level

Factoring in the two downward adjustments to which Knowlton is entitled (see II. B. and II. C. above), his Total Offense Level, absent application of the "safety valve,' is 14.

### E. Applicability of the "Safety Valve"

1. Knowlton has 0 criminal history points.

2. Knowlton did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense.

3. The offense did not result in death or serious bodily injury to any person.

4. Knowlton was not an organizer, leader, manager, or supervisor of others in the offense, and was not engaged in a continuing criminal enterprise as defined in 21 U.S.C. §848.

5. On October 19, 2004, together with undersigned counsel, Knowlton met for several hours at the United States Attorney's Office in Boston with assistant U.S. Attorney David Tobin, Drug Enforcement Administration Special Agents Steven Story and Timothy Desmond, and Gloucester Police Department Detective Sean Connors. At that meeting Knowlton truthfully provided to the government all information and evidence he had concerning the offenses that were part of same course of conduct or of the common scheme or plan, including but not limited to the offenses alleged in the instant indictment. Undersigned counsel took contemporaneous handwritten notes of the interview of Knowlton which total nine and three-quarters standard pages. Counsel shall have photocopies of those notes at the sentencing hearing to be filed under seal should the Court desire to examine them prior to imposing sentence.

Thus, Knowlton has met all five criteria of U.S.S.G. §5C1.2(a), and is, therefore, entitled to a 2 level downward reduction in his Total Offense Level pursuant to U.S.S.G. §2D1.1(b)(9). Accordingly, factoring in the "safety valve," his Total Offense Level is 12.

### F. Guideline Provisions without Departures

Based upon a Total Offense Level of 12 and a Criminal History Category of I, the guideline imprisonment range is 10 to 16 months.

## III. Departures

Knowlton is entitled to a departure for Aberrant Behavior pursuant to U.S.S.G. §5K2.20. His conduct meets the requirements of §5K2.20(b), and the departure is not prohibited under §5K2.20(c).

As described in II. A. above, Knowlton committed a single criminal occurrence or criminal transaction that (1) was committed without significant planning; (2) was limited in duration to one event on one day; and (3) represents a marked deviation from his otherwise law-abiding life as evidenced by his utter lack of prior criminal arrests, let alone convictions.

An Aberrant Behavior departure is not prohibited in this case because (1) the offense did involve serious bodily injury or death; (2) Knowlton did not discharge a firearm or otherwise use a firearm or a dangerous weapon; (3) the offense of conviction was not a serious drug trafficking offense (as, pursuant to *Application Note 1*, it was not a controlled substance offense under title 21 United States Code that provides for a mandatory minimum term of imprisonment of five years or greater); and (4) Knowlton has 0 criminal history points, and does not have a prior federal or state felony conviction, or any other prior criminal history at all.

Although the revised Presentence Report argues that Knowlton's "involvement in

9

this serious drug offense can be seen as an outgrowth of his illegal drug use which persisted over several years," it does not alter the fact that that persistent drug use resulted in Knowlton's participation in drug *distribution* on only one occasion.  No one, but no one, becomes a drug addict by choice; and this fact is truer when considering Knowlton's unique circumstances than, perhaps, when applied to any other individual's circumstances. Knowlton became addicted to OxyContin after the drug was prescribed to him by a physician following shoulder surgery.  Neither the doctor, nor especially Knowlton could remotely have foreseen that a legitimate prescription for pain medication would result in his addiction to OxyContin and heroin.  Every person's tolerance to medication and every person's susceptibility to addiction to particular substances are different.  Knowlton ought not to be denied a departure for Aberrant Behavior because he had a particular susceptibility to opiate addiction from which grew his involvement in a single act of distribution of controlled substances.

Accordingly, Knowlton ought to be awarded a departure for Aberrant Behavior, and his Guideline sentencing range ought, therefore, to be reduced by 50%.

## IV.  Other Factors Under 18 U.S.C. §3553

The primary mandate of 18 U.S.C. §3553(a) is that courts must impose a minimally sufficient sentence to achieve the statutory purposes of punishment.  §3553(a) states clearly, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  This provision, known as "the parsimony principle," is not merely a factor to be considered in determining a sentence.  Instead, it represents a cap above which a sentencing judge is statutorily prohibited from sentencing, even when a greater sentence is indicated by the sentencing guidelines.  See *United States v. Denardi*, 892 F. 2d 269, 276-77 (3d Cir. 1989)

10

(Becker, J., concurring in part, dissenting in part). The Court, in determining the appropriate sentence to be imposed upon Knowlton consonant with the "parsimony principle," must consider the following factors set forth in 18 U.S.C. §3553(a)(1) – (7):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
 (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
  (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
  (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
 (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement –
 (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
 (B) that, except as provided in section 3742(g), is in effect on the date the

>  defendant is sentenced.

(6) the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

### A. Efforts at Substance Abuse Treatment

Knowlton's history of substance abuse treatment is set forth with particularity in the Presentence Report at paragraphs numbered (140) through (144). This is clearly a part of his "history and characteristics" for which he ought to receive credit in sentencing. 18 U.S.C. §3553(a)(1). Of note is his voluntary disclosure to his parents in June, 2002 that he was addicted to OxyContin and heroin. He treated with Dr. Thomas Pearce, at first unsuccessfully. However, under Dr. Pearce's continued treatment, including the use of the narcotic-blocking medication Suboxone, Knowlton remained substance free from January, 2004 until his arrest on the instant offenses in late June, 2004. The Suboxone appeared to be successful in preventing relapse to and craving for Knowlton's particular substances of abuse.

Knowlton's efforts at substance abuse treatment ought to reflect favorably upon him in fashioning a sentence which provides him with "needed . . .medical care . . in the most effective manner." 18 U.S.C. §3553(a)(2)(D). After his arrest for the instant offenses, Knowlton was required by Pretrial Services to discontinue the use of Suboxone. Subsequently, he relapsed on two or three occasions which eventually resulted in his detention in December, 2005. It is reasonable to infer that the discontinuance of the medication, coupled with the stress and anxiety of the instant case, contributed greatly to his relapse into substance abuse. Knowlton's continued imprisonment would deny to him the most effective treatment he has yet received for overcoming his opiate addiction.

Knowlton's efforts at substance abuse treatment, both prior to and following his

12

arrest on the instant offenses is a factor that the Court ought to take into consideration, in light of *Jimenez-Beltre*, supra at 519, in awarding him a reasonable, non-guidelines sentence under 18 U.S.C. §3553.

### B. Cooperation with the Government

Independently of and in addition to application of the "safety valve," as discussed in II. E. above, the Court ought to award Knowlton a reduced sentence, pursuant to 18 U.S.C. §3553(a)(1), (a)(2)(A), (a)(2)(B), and (a)(2)(C) for his cooperation with the government. Knowlton's cooperation with the government has been previously detailed above in the section II. E. of this memorandum.

Even though the government has not filed a motion for a departure for substantial assistance pursuant to U.S.S.G. §5K1, and, indeed denies that Knowlton has met the fifth criterion of that section, the Court may still award Knowlton a reduced sentence pursuant to the latitude vested in it by *Booker*, as his effort to cooperate sheds favorable light on his "history and characteristics," 18 U.S.C. §3553(a)(1). It is also evidence of Knowlton's respect for the law following his indictment, (a)(2)(A), the deterrent effect his arrest and prosecution had on him, (a)(2)(B), and the likelihood that he will not re-offend, (a)(2)(C).

> [I]n formulating a reasonable sentence a sentencing judge must consider "the history and characteristics of the defendant" within the meaning of 18 U.S.C. §3553(a)(1), as well as the other factors enumerated in §3553(a), and should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. §5K1.1 ("non-5K cooperation"). Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what "history and characteristics of the defendant" are relevant. This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation. *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006).

Accordingly, Knowlton's effort to cooperate with the government is one more factor that the Court ought to take into consideration, in light of *Jimenez-Beltre*, supra at

519, in awarding him a reasonable, non-guidelines sentence under 18 U.S.C. §3553.

## V. Conclusion

Jared Knowlton was detained from June 29 to July 2, 2004, and has been detained since December 12, 2005, a total of 216 days as of July 12, 2006; or 7.18 months. In light of all the plausible, specific, and defensible reasons set forth above, the Court ought to sentence him to a term of imprisonment of time served, three years of supervised release, no fine, and a special assessment of $200.00.

|  |  |
|---|---|
|  | Respectfully submitted<br>Jared Knowlton<br>By his attorney, |
|  | /s/ Michael F. Natola |
| July 8, 2006 | _____<br>MICHAEL F. NATOLA<br>BBO No. 367580<br>63 Atlantic Avenue<br>Boston, Massachusetts  02110<br>Tel.  (617) 367-1199<br>Fax  (617) 227-3384<br>E-mail  MFNatola@aol.com |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing motion has been served the above date electronically upon Assistant U.S. Attorney David G. Tobin.

/s/  Michael F. Natola
_____